Argued and submitted December 23, 1997, convictions affirmed; remanded for resentencing April 22, 1998

## STATE OF OREGON,
*Respondent,*

*v.*

## GERALD DEAN SKELTON,
*Appellant.*

(9502265CR; CA A93635)

957 P2d 585

Dan Maloney, Deputy Public Defender, argued the cause for appellant. With him on the briefs was Sally L. Avera, Public Defender.

Janet A. Klapstein, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

ARMSTRONG, J.

### ARMSTRONG, J.

Defendant appeals from his convictions for three counts of first-degree manslaughter, ORS 163.118, one count of second-degree assault, ORS 163.175, one count of third-degree assault, ORS 163.165, and one count of driving under the influence of intoxicants (DUII), ORS 813.010. We remand for resentencing but otherwise affirm.

Between approximately 9:15 p.m. and 9:45 p.m. on September 2, 1995, defendant, who had a blood-alcohol content of approximately .23 percent, was driving a half-ton Chevrolet pickup when he collided with several motorcycles on Highway 140 in Klamath County. The motorcyclists involved in the accident were members of the Outsiders motorcycle club, which was on its way to a nearby gathering of motorcycle clubs. There were a total of seven motorcycles driving behind a lead car. As a result of the accident, three of the motorcyclists were killed and two others were injured. Defendant was found guilty of the listed offenses at trial, and the court sentenced him to a total of 540 months of incarceration on them. Defendant appeals.

Defendant first assigns error to the trial court's decision to exclude the testimony of defendant's expert on accident reconstruction, Tom Fries, that the collision would not have happened if one of the motorcycles had not been over the northern edge of the southern no-passing yellow line on the highway. Fries is a consulting mechanical engineer who specializes in accident reconstruction. According to his testimony and the diagrams that he made to reconstruct the accident, the accident took place on a two-lane highway. The two lanes of the highway were separated by two no-passing yellow lines. Defendant's pickup was traveling westbound and the motorcycles were traveling eastbound. Therefore, the lane in which defendant should have been traveling was north of the no-passing yellow lines and the lane in which the motorcycles should have been traveling was south of them. According to Fries, when defendant's pickup and the first motorcycle collided, defendant's pickup was over the northern no-passing yellow line and very close to the southern no-passing yellow line. The handlebar of the motorcycle and the

rider's left leg were over the southern no-passing yellow line. Fries testified that defendant's pickup was

> "clearly past the north center line. * * * And it is on and it's close to on and getting as close as you can get to, as we can determine from the measurements, to the southern edge. *And for there to be an impact, the motorcycle also has to be over that southern edge. For there to be impact and damage.*"

(Emphasis supplied.) On cross-examination, the state elicited testimony from Fries that defendant's pickup was "[p]robably not" entirely in its lane at the time of the accident. On redirect examination, defendant characterized that testimony as evidence that the accident would not have occurred if defendant's pickup had been "totally and completely" on the north side of the southern no-passing yellow line and he sought to ask Fries the following question:

> "Q: * * * [S]imilarly, if [the motorcyclist] had been completely in his lane with no part of his motorcycle protruding over the northern edge of the [southern] no passing lane, would this accident have occurred?
>
> "A: No."

The state objected. It noted that the expert had already testified that one of the motorcycles "was in the [no passing] lane." The state argued that the expert should not be able to go beyond that testimony and "answer a question that essentially says that [one of the victims] is guilty of contributory negligence, which is not a defense in this particular case." The trial court sustained the state's objection, saying to defendant: "You've made your point for the [j]ury."

On appeal, defendant argues that the trial court ruled that the evidence was not relevant under OEC 401[1] and that that ruling was erroneous because the evidence was relevant to the determination of whether defendant should be

---

[1] OEC 401 provides:

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

convicted of first-degree manslaughter or one of its lesser-included offenses, either second-degree manslaughter or criminal negligence.[2] The state counters that the trial court's statement that defendant had already made his point for the jury indicates that its ruling was essentially that the proffered evidence was cumulative. We agree with the state.

■■ We review a trial court's conclusion that evidence is cumulative for an abuse of discretion. *State v. Reyes*, 143 Or App 594, 602, 924 P2d 866 (1996). Assuming that defendant is correct that the proffered evidence was relevant, we conclude that the trial court did not abuse its discretion in excluding it. As noted above, defendant was able to elicit testimony from Fries that adequately described the location of defendant's pickup and the motorcycle at the time of the collision. In describing the positions, Fries explicitly stated that "for there to be an impact, the motorcycle also has to be over that southern edge. For there to be impact and damage." In context, that testimony is essentially identical to the proffered testimony because it points out that if the motorcycle had been located completely in its lane, there would have been no "impact and damage." In other words, if the motorcycle had been completely in its lane, there would have been no collision. Moreover, defendant argued without objection to the jury that the position of the motorcycle at the time of the accident was relevant to its decision about whether defendant should be convicted of first-degree manslaughter or one of the lesser-included offenses, either second-degree manslaughter or criminal negligence.[3] Finally, the trial court

---

[2] First-degree manslaughter requires that the defendant cause the death of another "recklessly under circumstances manifesting extreme indifference to the value of human life." ORS 163.118. It includes the lesser-included offenses of second-degree manslaughter, which requires only recklessness, ORS 163.125, which means that the defendant "is aware of and consciously disregards a substantial and unjustifiable risk," ORS 161.085(9), and criminally negligent homicide, ORS 163.145, which requires only criminal negligence, which means that the defendant "fails to be aware of a substantial and unjustifiable risk." ORS 161.085(10).

[3] Defendant's attorney expressly argued to the jury that "clearly, [the first motorcyclist hit was] across his side of the center passing lane also, making him, I think, as responsible as [defendant] for this collision." He explained to the jury defendant's theory of the case, which was that even a sober driver who momentarily crossed a center line could not have anticipated in the exercise of ordinary care that "he's going to encounter an oncoming vehicle that's going to be doing essentially the same thing." Therefore, he concluded, defendant could not be said to have shown a reckless indifference to human life.

instructed the jury on all three offenses and did not limit the jury's consideration of the evidence about the position of the motorcycle. We conclude, therefore, that the trial court did not abuse its discretion when it excluded the proffered testimony.

Defendant next assigns error to the trial court's decision to exclude, under OEC 401 and OEC 403, the testimony of two of defendant's witnesses, Ron Struble and Audrey Gardner. According to the offer of proof made by defendant, between 8:30 p.m. and 10:30 p.m. on the night of the collision, Struble and Gardner were traveling together from Lakeview to Klamath Falls on Highway 140.[4] They were traveling westbound, the same direction as defendant. Struble and Gardner did not see the accident but, at some point during that trip, neither of them could say when, they did pass a group of motorcycles. According to Struble, he first noticed the motorcycles when he saw headlights in the distance that "were spreading apart and getting close together." He was not sure what the lights signified but, to be cautious, he slowed down and moved to the right side of the road. He continued:

"Q:   And that was because of the motorcycles that were in your lane of travel?

"A:   *Well, they weren't really in our lane of travel.* But they were, that big a group of them. And some of them seemed like the lights had been going back and forth, which reflecting back on it—This happened four months ago. But reflecting back on it, it may have possibly been one of them passing another one or something that moved out in the lane.

"But to see these lights going back and forth caused me to be a little alarmed. And that many lights all in one group. I just—I didn't realize it was motorcycles or what it was until they had gotten quite a bit nearer to me."

(Emphasis supplied.) Struble testified that when he passed them he was driving "approximately 20 miles an hour. And I had moved up as far to the right on the road as I could." At that point, all of the motorcycles were clearly in their own

---

[4] Struble was driving, Gardner was in the front passenger seat and Struble's parents were in the back seat of the car.

lane. Struble could not be sure that he passed the Outsiders motorcycle club.

Gardner also was not sure that the group that they passed was the Outsiders. She testified that she first noticed the motorcycles when she saw numerous headlights that appeared to be heading towards her and Struble in their lane of travel. At that point, Struble slowed down considerably and moved over to the right side of the road. When she and Struble passed them, however, all of the motorcycles were inside their own lane.

The state objected to that testimony. It argued that the evidence was irrelevant, and, even if it were relevant, it should still be excluded under OEC 403 because the prejudicial value of the evidence outweighed its probative value. The state argued that the evidence was irrelevant for at least two reasons. First, it argued that defendant had failed to establish that the motorcyclists that Struble and Gardner saw were the Outsiders. Second, it argued that the evidence was irrelevant because there was no evidence that the motorcyclists that Struble and Gardner saw were driving recklessly. In other words, even if Struble and Gardner saw the Outsiders, their testimony did not make any fact at issue more or less probable. When the witnesses could see the motorcyclists clearly, they were all in their proper lane for travel. If they were, at some point, traveling in the eastbound as opposed to the westbound lane, there was no evidence that they were doing so improperly or illegally. They could have been passing someone, or "avoiding an animal in the road or doing anything." Therefore, the state argued, their testimony "is just way too attenuated to be relevant."

The trial court agreed, concluding that it was not sure the motorcyclists that Struble and Gardner saw were the Outsiders and that the witnesses did not "even really testify that they were doing anything wrong." Therefore, it excluded the evidence under OEC 401. It also concluded that, even if the evidence were relevant, it would be excluded under OEC 403.

■■ On appeal, defendant argues that the trial court's decision to exclude the evidence is incorrect for two reasons. First, he argues that the trial court applied the wrong legal

standard in determining whether to admit the evidence because, under *Carter v. Moberly*, 263 Or 193, 198, 501 P2d 1276 (1972), a trial court has discretion whether to admit evidence about how a party drove before an accident. Defendant argues that the trial court erred in this case because, rather than exercising discretion about whether to admit the proffered evidence, it made a legal ruling that the evidence was irrelevant. However, even assuming that defendant accurately describes the trial court's analysis, he describes no error. Before a trial court can exercise its discretion to admit evidence of a party's driving, it first must determine that the evidence is relevant.[5] *Id*. at 200. Here, the trial court concluded that the evidence was irrelevant. That conclusion properly ended the court's evaluation of the evidence.

■     Next, defendant argues that that legal conclusion is incorrect. He argues that the evidence supports an inference that Struble and Gardner saw the Outsiders soon before the accident and that the evidence is relevant because it would have helped the jury determine whether defendant should be convicted of first-degree manslaughter or one of the lesser-included offenses:

> "The motorcycles were operating in such a manner that they constituted a traffic hazard to any car coming in the other direction. Defendant was operating his truck coming [in] the other direction. The motorcycle was over the center line at the point of impact. Defendant's failure to be aware that a group of motorcycles would be traveling the highway not in their own lane of travel is not a circumstance that shows defendant's extreme indifference to the value of human life. The fact that a motorcycle would be in his lane of travel as he turned the corner is not a risk that defendant consciously disregarded. The evidence and the inferences sought to be drawn go directly to the issues the jury must decide."

Even if we were to assume that the evidence supports an inference that Struble and Gardner saw the Outsiders, we cannot agree that the evidence supports an inference that the

---

[5] Also, before a trial court can exercise its discretion to admit such evidence "there must be other evidence from which the jury could find that the party's conduct some time and distance before the accident continued up to at least shortly before the accident." *Cox v. Jacks*, 268 Or 180, 184-85, 519 P2d 1041 (1974).

motorcycles "were operating in such a manner that they constituted a traffic hazard to any car coming [in] the other direction." As the trial court found, the testimony does not indicate that the Outsiders were "doing anything wrong" or that they were driving in a hazardous manner. It merely indicates that Struble, when faced with an unknown situation while driving on a two-lane highway at night, proceeded cautiously. That evidence is not relevant because it does not make any issue "more probable or less probable than it would be without the evidence." *See* OEC 401. Therefore, we conclude that the trial court did not err in excluding the testimony.

Defendant's remaining assignments of error relate to his sentence. As noted, defendant was convicted of three counts of first-degree manslaughter, one count of second-degree assault, one count of third-degree assault and one count of DUII. With the exception of DUII, all of those crimes are subject to the sentencing guidelines. First-degree manslaughter and second-degree assault also are subject to Ballot Measure 11's mandatory minimum incarceration requirements.[6] Applying the sentencing guidelines, the trial court sentenced defendant to a departure sentence of 230 months of incarceration for the first count of first-degree manslaughter. On the other two counts of first-degree manslaughter and the second-degree assault count, the court imposed the mandatory minimum sentences under Measure 11: 120 months of incarceration for each count of first-degree manslaughter and 70 months of incarceration for the second-degree assault count. The trial court ordered that each of those sentences be served consecutively, for a total sentence of 540 months of incarceration.[7]

Defendant first argues that Measure 11 violates several provisions of the United States Constitution. We disagree. The Oregon Supreme Court has rejected challenges to Measure 11 based on the Guarantee and Equal Protection

---

[6] Ballot Measure 11, which established mandatory minimum sentences for a number of crimes, was adopted by the voters in 1994 and is codified at ORS 137.700 *et seq*. For convenience, we refer to it as Measure 11.

[7] The court discharged the third-degree assault conviction and imposed a 10-month sentence for the DUII conviction, which it ordered to run concurrently with defendant's other sentences.

clauses of the United States Constitution. *State ex rel Huddleston v. Sawyer*, 324 Or 597, 626, 630, 932 P2d 1145, *cert den* ___ US ___ , 118 S Ct 557, 139 L Ed 2d 399 (1997). In *Huddleston*, the court also concluded that the statute does not, on its face, violate a defendant's right to allocution.[8] *Id.* at 611-12. We have rejected arguments that Measure 11 violates the Eighth Amendment, which is applicable to the states under the Fourteenth Amendment, *State v. George*, 146 Or App 449, 458, 934 P2d 474 (1997), and that it violates a defendant's right to the assistance of counsel.[9] *State v. Parker*, 145 Or App 35, 39, 929 P2d 327 (1996), *rev den* 324 Or 654 (1997). Therefore, under our current law, defendant's constitutional claims are without merit.

Defendant also argues that the trial court improperly ignored the sentencing guidelines' "400 percent rule," which is one of two rules that limit consecutive sentences under the guidelines. OAR 213-08-007. The other is the "200 percent rule." OAR 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(2)(b). Under the 200 percent rule,

"no matter how many convictions arise out of a single case, if any of the sentences are imposed to run consecutively, the total incarceration term for all of the convictions combined

---

[8] In *Huddleston*, the court rejected an argument that Measure 11 violated a defendant's right to allocution under Article I, section 11, of the Oregon Constitution. 324 Or at 611-12. The court further noted that, if the federal constitution provided a comparable right, that right also was not violated. *Id.* at 628 n 24 (citing *Hill v. United States*, 368 US 424, 428, 82 S Ct 468, 7 L Ed 2d 417 (1962) (failure to allow opportunity for allocution was not error of constitutional magnitude)).

[9] The right to counsel is guaranteed by Article I, section 11, of the Oregon Constitution, and by the Sixth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment. In *Parker*, we rejected the defendant's argument that, "by denying the trial court the power to impose a sentence less than the mandatory minimum," Measure 11 denies a defendant the right to effective assistance of counsel. 145 Or App 38-39. Although we did not specify, it appears that we were referring to a defendant's right to counsel under Article I, section 11. In this case, defendant raises essentially the same argument under the Sixth Amendment. He does not offer any reason why our analysis of Measure 11's effect on the right to counsel under the Sixth Amendment should differ from our analysis of its effect on that right under Article I, section 11, nor can we discern a reason why it should. Therefore, we conclude that we effectively rejected defendant's argument in *Parker*. Cf. *State v. Meyrick*, 313 Or 125, 137-38, 831 P2d 666 (1992) (when determining whether defendant's right to counsel has been violated, court used similar analysis for the Sixth Amendment and Article I, section 11).

> may not exceed twice the maximum presumptive incarceration term for the primary offense, except by departure."

■ *State v. Davis*, 315 Or 484, 492, 847 P2d 834 (1993). The 400 percent rule applies when the trial court departs from the presumptive sentence. According to the 400 percent rule, "the maximum incarceration term that may be imposed for all the consecutive sentences together by departure cannot exceed four times the maximum presumptive incarceration term of the primary offense." *Id.*

■ Defendant concedes that he did not preserve his argument about the 400 percent rule at trial but asks that we exercise our discretion to review the trial court's failure to apply the rule. Under ORAP 5.45(2), when an error is not properly preserved below, we may consider it only if it is an "error[ ] of law apparent on the face of the record."[10] The state argues that the trial court's failure to apply the rule cannot be considered an error of law apparent on the face of the record because the 400 percent rule is inapplicable in this situation because first-degree manslaughter and second-degree assault are subject to Measure 11. In light of our recent decision in *State v. Langdon*, 151 Or App 640, 950 P2d 410 (1997), we disagree with the state's argument.

■ In *Langdon*, we harmonized Measure 11's mandatory minimum sentencing provisions with the limits on consecutive sentences found in the sentencing guidelines. We held that, in cases involving consecutive sentences that include incarceration imposed under Measure 11, the trial court cannot ignore the guidelines rules that limit the duration of consecutive sentences. Instead, the court must engage in a series of steps to determine what role the relevant rule plays in determining the sentence. If the mandatory minimum sentence that the court must impose for the Measure 11 offenses is greater than the limit established by the relevant guidelines rule, the rule prevents the court from imposing any additional incarceration beyond that minimum. *Id.* at 647. If the mandatory minimum sentence for the Measure 11 offenses is less than the limit established by the rule, then

---

[10] If we consider an error that was not preserved below, we must articulate our reasons for doing so. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 384, 823 P2d 956 (1991).

the rule establishes the outside limit for any additional incarceration beyond the minimum required for the Measure 11 offenses. *Id.*

■ Thus, *Langdon* prescribes a set of procedures that must be followed when a trial court is imposing consecutive sentences in a case that involves Measure 11 offenses. First, the court should determine the mandatory minimum sentence for the Measure 11 offenses. Next, it should determine the maximum term available for all of the felony offenses under the guidelines rules, using, as applicable, either the 200 or the 400 percent rule. Once the court has determined the mandatory minimum sentence for the Measure 11 offenses and the sentencing guidelines maximum sentence, it can impose the actual sentence. If the guideline maximum is less than the mandatory minimum, the court must impose the mandatory minimum for the Measure 11 offenses and impose concurrent sentences on the others. If the guideline maximum is higher, the court has more discretion. In that case, the court must impose the mandatory minimum, but may impose guideline sentences up to the amount allowable under the 200 or 400 percent rule, whichever is applicable.

A few examples help illustrate the point. In *Langdon*, the defendant had been convicted of two counts of kidnapping (counts 1 and 2), one count of first-degree unlawful sexual penetration (count 3) and one count of first-degree sexual abuse (count 6). All of those crimes are subject to the sentencing guidelines and Measure 11. He also was convicted of two counts of attempted first-degree sodomy (counts 4 and 5), which are not subject to Measure 11. The trial court imposed the mandatory minimum sentences under Measure 11 for counts 1, 2, 3 and 6 and the presumptive sentences under the sentencing guidelines for counts 4 and 5. The court ordered that the sentences on counts 2, 3, 5 and 6 be served consecutively, for a total incarceration term of 282 months.

Following the outlined procedures, we concluded that the trial court erred in imposing that sentence and remanded for resentencing. The mandatory minimum sentence for the Measure 11 offenses in that case was 265 months. The guidelines limitation on defendant's consecutive sentence was 120 months. Because the mandatory minimum

sentence exceeded the applicable limitation under the sentencing guidelines, the court could impose only the minimum sentence. Hence, the court could not impose a consecutive sentence on count 5.

■ This case provides another example. Here, defendant was convicted of three counts of first-degree manslaughter and one count of second-degree assault. The trial court determined that it was appropriate to impose consecutive sentences of incarceration on those counts. Therefore, as a preliminary step, the court should have determined the mandatory minimum sentence for them. The trial court concluded that the primary offense under the sentencing guidelines was the first count of first-degree manslaughter. Under the sentencing guidelines, the maximum presumptive term of incarceration for that conviction is 115 months.[11] Under Measure 11, first-degree manslaughter has a mandatory minimum sentence of 120 months of incarceration and second-degree assault has a mandatory minimum sentence of 70 months of incarceration. Because the Measure 11 sentence for the primary offense is greater than its presumptive sentence, the sum of the mandatory minimum sentences under Measure 11, 430 months of incarceration, equals the mandatory minimum sentence in this case.

Next, the court should have determined the maximum sentence permitted under the guidelines for all of the offenses. Because the court determined that a departure sentence on the primary offense was appropriate, it should have used the 400 percent rule to determine the maximum guidelines sentence. Under that rule, the maximum incarceration term that could be imposed for all of the consecutive sentences would be 400 percent of 115 months, or 460 months. Because the mandatory minimum for the Measure 11 offenses was less than the maximum sentence permitted

[11] The sentencing guidelines are presented in a grid format that guides the court in determining a convicted defendant's presumptive sentence. The crime seriousness scale is one axis of the grid. The criminal history scale is the other. OAR 213-04-001, App 1. First-degree manslaughter carries a rank of 10 on the crime seriousness scale. Defendant's criminal history placed him in category C on the criminal history scale. Therefore, defendant's presumptive sentence is determined by looking at the sentence range listed under 10C, which is between 111 to 115 months.

under the guidelines, the trial court had discretion in imposing defendant's sentence. However, in exercising its discretion, the court had to stay within the limit established by the 400 percent rule. In other words, it could not impose consecutive sentences that totaled more than 460 months of incarceration. Therefore, the court erred when it imposed consecutive sentences that totaled 540 months of incarceration.

We conclude that that error was an error of law apparent on the face of the record that we may exercise our discretion to review. An unlawful sentence, like the one in this case, is an error of law. *State v. Jones*, 129 Or App 413, 415, 879 P2d 881 (1994). The error is on the face of the record because "[w]e need not go outside the record or choose between competing inferences to find it, and the facts that comprise the error are irrefutable." *See State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990). Finally, the legal point is apparent because, in light of our recent decision in *Langdon*, it is obvious and not reasonably in dispute. *See Jones*, 129 Or App at 416. We exercise our discretion because the error in this case significantly affects defendant by adding 80 months to his sentence, and the correction of the error may be accomplished with a minimum of judicial time and resources. Therefore, we remand the entire case for resentencing. ORS 138.222(5).

Convictions affirmed; remanded for resentencing.