Argued and submitted October 17, 2002, at Lake Oswego High School, Lake Oswego, affirmed March 6, 2003

## STATE OF OREGON,
*Respondent,*

*v.*

## IVAR VOITS,
*Appellant.*

## C990596CR; A111593

64 P3d 1156

Andrew D. Coit argued the cause for appellant. With him on the brief was Des & Shannon Connall, LLP.

Kaye E. McDonald, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

BREWER, J.

## BREWER, J.

Defendant appeals from his conviction for murder, ORS 163.115, asserting six assignments of error. In his first and second assignments of error, he challenges the trial court's denial of his motions to suppress evidence discovered in several searches of his home and a search of his workplace. In his third, fourth, and fifth assignments of error, he argues that the trial court erred in admitting hearsay evidence in the form of 42 letters written by the victim as well as the testimony of two witnesses regarding statements that the victim made to them. In his sixth assignment of error, defendant challenges the trial court's denial of his motion for a mistrial after the prosecutor, during opening statement, read from a document that referred to defendant's pretrial incarceration. We affirm.

We are bound by the trial court's historical findings of fact relating to defendant's motions to suppress,[1] if supported by evidence in the record. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Further, because defendant was convicted by a jury, we view the evidence at trial in the light most favorable to the state. *State v. Clegg*, 332 Or 432, 434, 31 P3d 408 (2001). We state the facts with those standards in mind.

Defendant moved to Portland in 1996 and, in 1997, he was joined by his wife, the victim in this case, and their two young sons. The victim became romantically involved with another man, Vilnis Sils, in August 1998 and began to communicate with him by mail and telephone. Beginning in September 1998, the victim engaged in written correspondence with her friends and family, relating her desire to divorce defendant, her happiness with Sils, and her hopes and fears about the future. On December 15, 1998, the victim

---

[1] Defendant filed numerous pretrial motions, including two motions to suppress evidence. His first assignment of error, challenging the warrantless entry of police into his residence on January 3, 1999, involves the motion to suppress denominated "Defendant's Motion to Suppress Evidence (No. 2)." Defendant's second assignment of error involves defendant's other motion to suppress, denominated "Defendant's Motion to Suppress; Supplemental Motion to Controvert," which challenges the search warrant affidavit and two searches conducted on January 15, 1999. The trial court considered, made findings of fact applicable to, and ruled on those motions together.

caused defendant to be served with summons in an action to dissolve their marriage.

On the morning of January 3, 1999, defendant called 9-1-1 to report that the victim had committed suicide at the family residence. Officers Clow and Thatcher were dispatched to the scene. They arrived at the residence at 7:22 a.m. and entered through the front door, which was ajar. The officers found defendant speaking with rescue personnel, who had arrived first. Thatcher asked defendant what had happened. Defendant explained that, when he woke up that morning, he had found the victim dead and that she apparently had committed suicide. Thatcher asked for permission to go upstairs, where the victim's body had been found, to examine the death scene. Defendant verbally consented to that request.

Once upstairs, the officers made several observations that they believed were inconsistent with the victim having shot herself. They photographed the scene and then called for investigative assistance. Detective Groth arrived at 8:30 a.m. and started a crime scene log. At 9:06 a.m., Clow presented to defendant a written consent to search form, which defendant signed. The officers and other investigators then searched the residence and photographed, measured, and seized various items. Several officers also returned to defendant's residence the next day. Defendant invited them inside, signed another written consent to search the residence, and consented to interviews of himself and his children. Once again, defendant permitted the officers to search upstairs and, during that search, the officers seized several items and took copies of dissolution papers that defendant gave them.

Defendant contacted the police on January 8, resulting in another police interview at his residence. During that interview, officers informed defendant for the first time that they believed that he had killed the victim. On January 9, defendant went to the Washington County sheriff's office, executed a written waiver of his *Miranda* rights, and then was interviewed for three hours by police.

On January 14, police obtained a warrant to search defendant's residence and workplace and, the next day, a

detective called defendant and asked to meet him at his residence. Defendant agreed. At the residence, the detective asked defendant for permission to search, and defendant responded, "[N]o problem; like I've said before." The police then showed the warrant to defendant and searched defendant's residence again, and they also searched his workplace. The officers seized evidence from both locations.

On March 1, 1999, defendant was arrested and charged with murder. Before trial, he moved to suppress evidence obtained from the searches of his residence and workplace on the grounds that the officers had unlawfully entered his residence on January 3 and that the evidence obtained in that search and the ensuing searches was tainted by the unlawful entry. Defendant also moved to controvert the affidavit supporting the January 14 search warrant and to suppress evidence discovered in that search, arguing that the warrant was not supported by probable cause. In addition, defendant moved to exclude the victim's statements as hearsay and opposed the state's corresponding motion to admit that evidence.

After a hearing, the trial court denied the motions to suppress. The court also granted the state's motion to admit the victim's letters, but it redacted portions of 17 of the letters. The court held a preliminary hearing with respect to the victim's oral statements proffered through the testimony of her neighbor, Jill McClure, and her sister-in-law, Christine Strautnieks. The court ruled that some of the statements were admissible, and it excluded others. Finally, as pertinent here, defendant moved for a mistrial during the prosecutor's opening statement when the prosecutor referred to the fact that defendant had been incarcerated. The trial court denied that motion. The jury convicted defendant, and he was sentenced to life imprisonment with a mandatory minimum sentence of 25 years. ORS 137.700; ORS 163.115.

In his first assignment of error, defendant asserts that the trial court erred in denying his motion to suppress evidence found in the warrantless search of his residence on January 3, 1999, and in the ensuing searches of his residence and workplace, because the January 3 search violated Article

I, section 9, of the Oregon Constitution. That assignment of error includes the following subarguments: (1) the police officers' initial entry into the residence was unlawful; (2) defendant's oral consent to the search was not voluntary and, even if it was, both it and defendant's consents to later searches were tainted because police exploited their unlawful entry on January 3 to obtain them; and (3) the search exceeded the scope of defendant's consent, in particular, as to the persons who could search.[2]

The state replies that the officers' entry was either justified by an exception to the warrant requirement or, if unlawful, was not exploited to obtain defendant's consent to search. The state also contends that defendant's consent to search was voluntary and that, in consenting, defendant did not limit the persons who could search.

■ We begin with defendant's first subargument, namely, that the officers' initial entry into his residence was unlawful. Warrantless searches are *per se* unreasonable under Article I, section 9, unless they fall within a recognized exception to the warrant requirement. *State v. McDonald*, 168 Or App 452, 456, 7 P3d 617, *rev den*, 331 Or 193 (2000). The state relies on three exceptions to justify the officers' entry into defendant's residence: exigent circumstances, the emergency aid doctrine, and consent. We conclude that defendant consented to the entry. By calling 9-1-1, reporting a suicide, failing to restrict his request for assistance to medical personnel, admitting emergency personnel into his residence, and leaving the front door ajar, defendant manifested his consent to the police officers' initial entry into his home to investigate the death of a person. *See State v. Paulson*, 313 Or 346, 352, 833 P2d 1278 (1992) (evidence could establish consent where person called 9-1-1, did not limit her request to medical personnel, and opened the door for police and paramedics).

---

[2] Defendant also argues that, even if exigent circumstances justified the officers' entry, the exigency soon abated, and the police then were required to obtain a warrant before proceeding to search. Because we do not reach the issue of whether the officers' entry was justified by an exigency, we need not consider that argument.

■■ We turn to defendant's contention that his oral consent to the search on January 3 was not voluntary.[3] The trial court found that, "at the time defendant initially spoke to Officers Clow and Thatcher he was not in custody, not under the influence of intoxicants nor suffering from any mental or physical disabilities. No threats or promises to induce him to speak were made" and that "all searching of the residence and seizure of items on 1-3-99 was with the consent of defendant." Those facts bind us because they are supported by evidence in the record. *Ehly*, 317 Or at 75. We review the trial court's ultimate conclusion that defendant's consent was voluntary for errors of law. *State v. Stevens*, 311 Or 119, 135, 806 P2d 92 (1991).

■■ Voluntariness focuses on the effect of police conduct on a defendant's state of mind. *State v. Hall*, 183 Or App 48, 58, 50 P3d 1258 (2002), *rev allowed*, 335 Or 195 (2003). In *State ex rel Juv. Dept. v. Stephens*, 175 Or App 220, 225, 27 P3d 170 (2001), we held that, "[i]n analyzing whether consent to a search is voluntary, the relevant inquiry is whether, under the totality of the circumstances, the consent was the product of the defendant's free will or, conversely, was the result of express or implied coercion." Here, there is no evidence suggesting that defendant felt compelled to consent. The officers had no reason to suspect defendant of any crime when they initially entered his home and asked him for consent to examine the death scene upstairs. *See State v. Larson*, 141 Or App 186, 198, 917 P2d 519, *rev den*, 324 Or 229 (1996) (noting that considerations in voluntariness analysis include whether the person giving consent is the subject of an investigation). Nor did the officers make a show of authority that might have caused defendant to believe that he had no choice but to consent, because a search was "bound to occur." *State v. Freund*, 102 Or App 647, 652, 796 P2d 656 (1990) (where officer stated that "he was there" to pick up the marijuana and that he wanted to do it calmly, the statement "told defendant that she had no choice whether a search would occur;

---

[3] Defendant does not contend that the written consent to search that he signed on January 3 was not voluntary.

her only option was whether the search and seizure was to be 'calm and efficient' "); *see also State v. Will*, 131 Or App 498, 506, 885 P2d 715 (1994) (where officer was already in the house and had informed the defendant's mother that he had made contact with the defendant and would be seizing narcotics, her consent was not voluntary). We conclude that defendant's oral consent to search on January 3 was voluntary.[4]

We also reject defendant's argument that the officers exceeded the scope of his consents to search by engaging other investigative personnel in the search. There is no evidence that defendant limited those consents to particular persons. *See State v. Lerch*, 63 Or App 707, 713, 666 P2d 840 (1983), *aff'd*, 296 Or 377, 677 P2d 678 (1984) (where circumstances indicated that defendant's consent was "general and unqualified," crime lab personnel could assist in the search).

Having rejected defendant's subarguments, we conclude that the trial court did not err in denying his motion to suppress evidence obtained in the search of his residence on January 3, 1999.

■ We turn to defendant's second assignment of error, in which he asserts that the trial court erred in denying his motion to suppress evidence obtained when, on January 15, 1999, police executed a search warrant at defendant's residence and workplace. Defendant makes two arguments pertaining to the January 15 searches. First, he asserts that the

---

[4] Even if we concluded that defendant did not consent to the officers' initial entry, we would conclude that the trial court properly denied suppression, because the officers did not exploit that conduct to obtain defendant's voluntary consent to search. *State v. Rodriguez*, 317 Or 27, 39-40, 854 P2d 399 (1993) (evidence obtained in a search authorized by a defendant's voluntary consent need not be suppressed even if preceded by unlawful police conduct, unless the police traded on or otherwise took advantage of that unlawful conduct in obtaining consent). The officers intended to seek permission to examine the death scene of a reported suicide victim when they entered the residence. They did not trade on or otherwise take advantage of the circumstances of their entry to obtain defendant's oral consent to conduct that search. From that conclusion, it follows that the police also did not exploit their initial entry to obtain defendant's written consent to search the residence following their examination of the death scene pursuant to his oral consent.

detective who executed the affidavit in support of the warrant did not have probable cause to believe that he had committed any crime and, therefore, lacked probable cause to believe that evidence of a crime would be found at either location. Because that particular argument was not made before the trial court, and defendant does not contend that it implicates our review for plain error, we decline to consider it. ORAP 5.45(2); *State v. Stevens*, 328 Or 116, 122, 970 P2d 215 (1998) (preservation requirement is not a "cursory search for some common thread, however remote, between an issue on appeal and a position that was advanced at trial").

■ ■ Second, defendant argues that the affidavit did not demonstrate probable cause to believe that the requested search would yield evidence of a crime. Because defendant has not challenged on appeal the denial of his motion to controvert, our review of that argument is limited to determining whether the facts in the affidavit established probable cause to search defendant's residence. *State v. Yuen*, 182 Or App 387, 393, 49 P3d 819 (2002).

The affidavit, executed by Groth, described the locations and characteristics of various pillows and blood stains in the master bedroom of defendant's residence where the victim's body was found, stated that officers found the gun in an uncocked position, stated that it was "unlikely" that "a person with two bullet[ ] wounds to the head could have manually lowered the hammer on the gun," and stated that, in Groth's opinion, the death scene had been altered to conceal the commission of a crime. The affidavit also described statements that defendant had made throughout the investigation and noted that defendant had "added to and changed his story." The affidavit stated that defendant had told police that, because of his wife's mood swings, he had locked up all of his guns in the garage but that, when defendant showed police the guns, some were located in the garage and were not locked up, while others were found in a locked cabinet inside the house. The affidavit also included several witnesses' statements to the effect that the victim was a happy, future-oriented person who would not have taken her own life and that the victim had told them that she was afraid of her husband. Groth also averred that, in his experience, people

who commit suicide leave notes or otherwise make final arrangements but that the victim had not done so. Groth also stated his reasons for believing that evidence of a homicide could be found at defendant's residence and at his workplace, including the fact that only defendant used his office.

With regard to whether the facts and circumstances disclosed by the affidavit establish probable cause, we have recently described the settled legal principles that govern our review:

> "To be sufficient, an affidavit in support of a warrant must permit a conclusion by a neutral and detached magistrate that the items specified in the warrant will probably be found in a specified place to be searched. The standard is one of probability, which requires more than a mere possibility but less than a certainty. In testing an affidavit, a court is to construe it 'in a commonsense, nontechnical and realistic fashion looking at the facts recited and the reasonable inferences that can be drawn from those [facts].' Because of the preference for warranted searches over those conducted without prior judicial authorization, doubtful cases are to be resolved by deferring to an issuing magistrate's determination of probable cause."

*State v. Wilson*, 178 Or App 163, 166-67, 35 P3d 1111 (2001) (bracketed material in original; citations omitted). Here, the application of those principles is straightforward. The information in Groth's affidavit strongly indicated that the victim's death was caused by homicide and that defendant had not been forthright in his account of the surrounding circumstances. The affidavit amply provided probable cause to believe that evidence of a crime would be found at the locations to be searched. Accordingly, the trial court did not err in denying defendant's motion to suppress evidence obtained from the January 15 searches.

 In his third, fourth, and fifth assignments of error, defendant challenges the trial court's admission into evidence of 42 letters written by the victim.[5] Defendant also

---

[5] Of the 42 letters, 32 were written to Sils, three were to her attorneys, six were to family members, and one was to a friend. The majority of the letters were written in Latvian and were translated for purposes of the trial in this case. Defendant does not raise any issue on appeal concerning the accuracy of the translations.

challenges the admission of certain portions of the testimony of McClure[6] and Strautnieks,[7] in which they described statements that the victim had made to them. Defendant addresses those assignments of error in a combined argument. He asserts that most of the victim's declarations were not relevant to any issue in the case, that all of the declarations were inadmissible as hearsay, that, even if otherwise admissible, they were subject to exclusion under OEC 403, and that their admission violated his constitutional confrontation and due process rights.

 We begin with the question whether the challenged declarations were relevant. OEC 401 provides that, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The rule establishes a "very low threshold" for the relevance of proffered evidence. *Clegg*, 332 Or at 441-42. Relevant evidence can include evidence relating to a crime victim's state of mind or future intentions. *See United States v. Brown*, 490 F2d 758, 767, 774 (DC Cir 1973) (victim's state of mind was relevant to suicide

---

[6] Defendant challenges the following portions of McClure's testimony:

"[PROSECUTOR]: In response to [the victim] telling you that [she planned to tell defendant that there was going to be no reconciliation as soon as New Year's Day was over], what was — how did you respond to that?

"[McCLURE]: I begged her to wait until I came back the following Monday so that—

"[PROSECUTOR]: On the 4th?

"[McCLURE]: On the 4th. I begged her to wait to talk to him until I was back in town. And she told me that she could not wait. That she wanted this to proceed. She wanted it to go on. She wanted him to move out. And that she was looking very much forward to the time when she and the boys were going to be alone together without him in the home."

[7] Defendant challenges the following portion of Strautnieks's testimony:

"[PROSECUTOR]: Okay. What did she tell you was her husband's reaction or response to being served with divorce papers?

"[STRAUTNIEKS]: She said he was depressed and that he was suicidal.

"[PROSECUTOR]: Did [the victim] tell you at that time her response to defendant being depressed and suicidal?

"[STRAUTNIEKS]: Um, yes. She was concerned and she said that, um— that she hoped that he did not take her and the boys with him because she was not ready to leave this earth."

defense under Federal Rule of Evidence 401, which is identical to OEC 401; noting two types of relevance: relevance of victim's state of mind to issue in the case and relevance of statement as probative of that state of mind). Where evidence of the victim's state of mind or future intentions is relevant to one or more issues in the case, that evidence may be either direct or circumstantial. *Clegg*, 332 Or at 441 (noting that statements at issue were not direct evidence of the victim's state of mind but "reflect[ed] * * * or reasonably support[ed] an inference as to the declarant's state of mind"); *Brown*, 490 F2d at 762-63 (observing that statement can show state of mind directly, such as "I hate X" or circumstantially, such as "X is no good"). We review the trial court's determination of relevance for errors of law. *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999).

In this case, the state offered the victim's challenged declarations for two purposes. First, it offered some of those declarations to show the victim's positive state of mind, in particular, that she was looking forward to a future life with Sils. An example is the victim's declaration in a letter to Sils, that "I have a dear friend with whom I am planning to be in the future."[8] According to the state, that evidence was relevant to refute defendant's theory that the victim had committed suicide. Second, there was evidence at trial that, on numerous occasions, defendant told police and others that the victim had abandoned her plans to dissolve their marriage; those statements were intended to support defendant's theory that he had no motive to kill the victim. An example is the victim's declaration to Sils that "I have to look completely independent through the divorce and this is the way it will be."[9] The state contended that declarations by the victim showing her intention to proceed with the dissolution of her marriage were relevant to rebut evidence of defendant's contrary statements.

---

[8] Other examples are the victim's declarations to Sils that "I want you and me to have lives joined together"; "In the future, I will make you so happy"; "in the future things will be very good"; and "I plan to be careful with money in the future."

[9] Other examples of declarations offered for that purpose include the victim's statements to Sils that "[i]t would not be pleasant if during the divorce proceedings my husband found out something about us"; "in the future when I am free from my oppressive situation"; and "I only want my freedom!"

Defendant asserts that many of the victim's statements were not relevant under OEC 401 or, alternatively, that they would have become relevant only in rebuttal and only if defendant had opened the door to their admission. However, in asserting his *relevance* objection, defendant does not challenge the relevance of evidence that directly pertained to one of the state's previously described purposes—the purpose of showing the victim's state of mind of looking forward to the future and the purpose of showing the victim's intent to proceed with the dissolution of her marriage. Instead, he argues that, "[i]n general," the victim's "recitation of past events and her relationship with others did not make it more probable or less probable that defendant killed her or that she killed herself." In making that argument, defendant does not direct our attention to any specific evidence the admission of which he claims was improper. We therefore understand his objection to be a general one to the contextual and background information about the victim's life, including references to defendant, that was interspersed throughout the letters.

We conclude that, notwithstanding that contextual material, all of the evidence at issue here satisfied the minimal standard for relevance under OEC 401. Although the contextual material itself had limited, if any, *independent* relevance to an issue in the case, the trial court properly admitted it, because it assisted in establishing the relevance of the victim's declarations of her own state of mind or future intentions.[10] *See* Legislative Commentary, *quoted in* Laird C.

---

[10] An example that the trial court used in ruling on defendant's relevance objection aptly makes the point:

"[O]kay. * * * the second paragraph. 'How things are: Ivar keeps telling me that he loves me, that he wants to straighten, quote, us, unquote out, and to go forward, forgetting all the painful things. He thinks that I feel the same. Ha. He has even said that I need him, he needs me. Yes, sure, ha, ha.'

"Okay. Clearly that paragraph illustrates the deceased's state of mind. But to take your viewpoint, the only thing that would be relevant and admissible would be the first 'ha,' with the exclamation point, and the second 'yes,' exclamation point, 'sure, ha, ha.'

"Do you see my point? *There's no way that the jury can determine what the state of mind is without some kind of reference basically to the other information that's contained therein.* * * * And the Court * * * has to do a couple of things: first of all, maybe consider a limiting instruction to the part that would not otherwise be admissible, or if it is admissible, you know, and it's prejudicial, basically do a balancing test under [OEC] 403.

Kirkpatrick, *Oregon Evidence* § 401.02, Art IV-4 (4th ed 2002) ("Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding."). More significantly, the core declarations made by the victim clearly were relevant to establish her positive state of mind about the future and her intention to proceed with the dissolution of her marriage. In short, all of the challenged evidence, considered together, was relevant.[11]

Defendant next argues that all of the victim's declarations were inadmissible as hearsay. First, defendant asserts that "the substance of the statements was almost entirely statements of memory or belief, specifically excluded by the rule." In explanation, defendant contends that the declarations "almost all related to *why* [the victim] had a particular state of mind or future intent, rather than *what* that state of mind or future intent was." (Emphasis in original.) A primary focus of defendant's first argument is a letter dated December 28, 1998, that the victim wrote to her attorney and that the trial court admitted in its entirety. The letter states:

> "My husband, Ivar, and I are still living in the same house. We're 'talking' and doing so civilly. That's fine. He's wanting me to forget the past [and] start over. *I've been 'thinking' about that but not changing my mind as he wants me to.*
>
> "He's asked me, repeatedly, to stop the proceedings. I've said no, that he must get a lawyer [and] the necessary paperwork into your office by Jan. 13th.
>
> "He said the other nite [*sic*] he will not have a lawyer, that he will be his own. Fine.

---

"But I think that your analysis here in terms of what you put up there presumes that you can determine the state of mind without any kind of reference to the other information * * *. Because 'Sure, yes, ha, ha,' and 'ha,' standing alone don't tell us anything."

(Emphasis added.)

[11] Defendant also asserts, without citation to any supporting authority, that, even if relevant, the victim's declarations were admissible only in rebuttal to his defense of suicide, not in the state's case-in-chief. Defendant is mistaken. *See State v. Sullivan*, 152 Or App 75, 79-80, 952 P2d 100 (1998) ("When defense evidence is predictable, the state may meet that evidence in its case in chief and need not await rebuttal to disprove it.") .

"As you see, he [and] I are 'coasting, albeit unhappily' thru this upcoming holiday. I'll probably be in touch w/you Jan. 4 or thereafter for further advice."

(Emphasis added.) Defendant argues that almost

"the entire letter deals with [the victim's] recitation of past occurrences, including her recollection of many of defendant's statements. If the last sentence was a statement of future intent, it was not relevant. Even if it was, the remainder of the letter should have been redacted."

Second, defendant asserts that many of the declarations were offered to establish his own state of mind and predict his future conduct, purposes not permitted under OEC 803(3). *See* Legislative Commentary, *quoted in* Kirkpatrick, *Oregon Evidence* at § 803.03(2), Article VIII-77 ("the Legislative Assembly intends to * * * render statements of intent by a declarant admissible only to prove the declarant's future conduct, not the future conduct of another person"). A primary example of that problem, as defendant sees it, is a letter to Sils dated Friday, December 11, in which the victim wrote that, "If he commits suicide, then I hope he does not take me and the children with him." According to defendant, that letter, and others of a similar kind, "were offered to prove that defendant had become suicidal and had contemplated either suicide or murder-suicide[.]"

OEC 801(3) provides that " '[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Thus, statements offered for their truth are hearsay and, in order to be admissible, must be subject to an exception. In this case, the trial court admitted the statements under OEC 803(3). That exception provides:

"The following are not excluded * * * even though the declarant is available as a witness:

"* * * * *

"(3) A statement of the declarant's then existing state of mind, emotion, sensation or physical condition, such as intent, plan, motive, design, mental feeling, pain or bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to

the execution, revocation, identification, or terms of the declarant's will."

The Supreme Court has explained that statements that constitute circumstantial evidence of the declarant's state of mind, as well as statements directly addressing the declarant's state of mind, are hearsay assertions admissible under OEC 803(3). *Clegg,* 332 Or at 441; *see also* Kirkpatrick, *Oregon Evidence* § 803.03(3)(a) at Art VIII-77 (noting that authorities have been divided as to whether statements that constitute circumstantial rather than direct evidence of state of mind are hearsay; noting that the issue has "little practical significance" because, even if hearsay, such statements are nonetheless admissible under the state-of-mind exception).

We apply those principles here. We first conclude that much of the contextual or "background" material discussed above in regard to defendant's relevance arguments simply was not hearsay. That is because, although the material was relevant as an aid to understanding, it constituted neither direct nor circumstantial evidence of the victim's state of mind or future intentions, and therefore was not offered to prove the truth of the matters asserted.

We also conclude that the remainder of the victim's declarations, although hearsay, were admissible as either direct or circumstantial evidence of the victim's state of mind or future intentions. Specifically, some of the declarations were admissible to show the victim's positive outlook on, or hopes for, the future, in contrast to defendant's statements that she was suicidal; the victim's December 11 declaration typified that purpose. Other declarations—such as the victim's December 28 letter to her attorney, quoted in full above, and her statements to Sils that "[defendant] is old-fashioned, chauvinistic, [and] arrogant" and that defendant has "wounded my heart and soul"—demonstrated, either directly or circumstantially, the victim's intention to follow through with the dissolution of her marriage. Moreover, the statements were admitted for those purposes and not, as defendant asserts, to prove facts *about defendant* that the victim remembered or believed, or to show defendant's own future

conduct. The question of how to treat evidence that is admissible to show the declarant's state of mind or future intentions but is inadmissible for other purposes is a legitimate one. However, that question properly is addressed in connection with defendant's arguments under OEC 403, to which we now turn.

■ ■ Defendant argues that the victim's declarations should have been excluded under OEC 403 because their probative value was substantially outweighed by the danger of unfair prejudice in admitting them. Defendant also asserts that the evidence was cumulative and that the trial court's limiting instruction to the jury concerning its use was inadequate. We review a trial court's decision to admit or exclude evidence under OEC 403 for abuse of discretion. *State v. Minchue*, 173 Or App 520, 523, 24 P3d 386 (2001). We also review for abuse of discretion the court's decision to admit evidence despite defendant's objection that it was cumulative. *State v. Skelton*, 153 Or App 580, 584, 957 P2d 585, *rev den*, 327 Or 448 (1998).

■ We conclude that the court did not abuse its discretion in refusing to exclude the challenged declarations under OEC 403. Each of those declarations had probative value because it tended to show the victim's determination to end her marriage to defendant and her forward-looking and positive state of mind during the four-month period preceding her death. Further, although, as we have noted, some of the declarations cast defendant in a bad light, the trial court was mindful of the risk that defendant would be prejudiced. At defendant's request, the trial court gave the following limiting instruction to the jury:

> "Testimony and exhibits have been offered into evidence regarding purported statements of the [victim]. You must first determine whether or not [the victim] made the statements. If you find that she made the statements, then you may consider them only for the purpose of determining what her then existing mental or emotional condition was, or her then existing intent or plans.

> "Some of the statements offered do not directly address her state of mind or intent. These statements, if made, are not offered for the truth of the matters contained in them,

but merely for context to explain the statements that directly address her state of mind, intent, or plans.

"I caution you that in evaluating all statements of [the victim] that are offered, that she is not available to be examined concerning her knowledge or lack of knowledge regarding the matters of which she speaks, her reasons for making the statements, and the circumstances in which the statements were made.

"Some of the purported statements of [the victim] deal with alleged statements that the defendant * * * made. And regarding those statements, I have the further cautionary instruction:

"When a witness testifies about statements made by the defendant, you should consider such testimony with caution. In reviewing such testimony, you should consider, among other things, the following:

"Did the defendant make the statement? And, if so, did the defendant clearly express what he intended to say?

"Did the witness correctly hear and understand what the defendant said?

"Did the witness correctly remember and relate what the defendant said?

"Did the witness intentionally or mistakenly alter some of the words used by the defendant, thereby changing the meaning of what was actually said?

"And that's the cautionary instruction."

A limiting instructing often is an appropriate means to safeguard against jury misuse of evidence that is admissible to show a declarant's state of mind but is inadmissible for other purposes. *See* Kirkpatrick, *Oregon Evidence* § 803.03(3)(a) at Art VIII-79 ("A statement admitted to show the declarant's state of mind, emotion, sensation, or physical condition may also contain an assertion regarding other facts. A limiting instruction under [OEC] 105 may be necessary to prevent the jury from considering the statement for the truth of the factual assertion contained within it."). The instruction given in this case admonished the jury to consider the victim's declarations only for the purposes of determining either her then-existing mental or emotional condition or her

intent or plans. It also informed the jury that declarations that constituted circumstantial evidence of the victim's state of mind could not be considered for the truth of the matters asserted but, rather, were offered merely as context to explain the declarations that directly addressed the victim's state of mind, intent, or plans. Moreover, very few of the victim's declarations that were admitted in evidence referred directly to defendant's conduct and, of those that did, they did not refer to specific acts. Under the circumstances, the limiting instruction was sufficient to prevent any prejudice that otherwise might result from admission of the challenged declarations or, even if there was prejudice, prevented it from substantially outweighing their probative value. The trial court did not abuse its discretion in admitting the challenged evidence despite defendant's objection under OEC 403.[12]

Finally, we consider defendant's contention that admission of the challenged declarations violated his right to confront witnesses under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution.[13] We first consider defendant's argument under Article I, section 11. The admission of hearsay under an exception to the hearsay rule does not violate a defendant's constitutional right of confrontation under Article I, section 11, if the state demonstrates that the declarant is unavailable and the evidence has "adequate indicia of reliability." *State v. Moore*, 334 Or 328, 333-34, 49 P3d 785 (2002) (providing overview of state and federal constitutional standards and setting out two-part test). The second requirement is satisfied if the evidence was admitted under a "firmly rooted" hearsay exception. *Id.* at 334. Here, of course, only the second requirement arguably is in dispute.

---

[12] We also conclude that the trial court did not abuse its discretion in ruling that the challenged evidence was not unduly cumulative. As the court stated, "they * * * cover a period of approximately four months [and] * * * the number of them, the frequency of them, and the tone of them have something to say about their value * * *."

[13] We decline to address defendant's separate due process and fair trial arguments because he has not provided any developed argument regarding those claims. *State v. Barone*, 329 Or 210, 233 n 15, 986 P2d 5 (1999), *cert den*, 528 US 1086 (2000) (declining to address undeveloped claim of constitutional error and noting that mere invocation of a constitutional provision, "unaccompanied by substantial argument or any reference to authority, is insufficient to provide [this court] a meaningful basis to review any specific constitutional question").

Defendant does not argue that OEC 803(3), the applicable hearsay exception, is not firmly rooted for confrontation purposes, nor does he explain why the challenged evidence does not possess adequate indicia of reliability. Accordingly, we decline to further consider defendant's undeveloped argument under Article I, section 11. For the same reason, we reject defendant's argument under the Sixth Amendment. He has failed to explain why, if the declarations are admissible under OEC 803(3), they do not fall either within a firmly rooted hearsay exception or otherwise bear adequate indicia of reliability to satisfy the requirements of the Confrontation Clause. *See Idaho v. Wright*, 497 US 805, 816, 110 S Ct 3139, 111 L Ed 2d 638 (1990) (describing Sixth Amendment confrontation requirements).

■■■■■ We turn briefly to defendant's sixth and final assignment of error, in which he argues that the trial court erred in denying his motion for a mistrial when, during opening statement, the prosecutor read a document to the jury in which defendant referred to his pretrial incarceration on the charge in this case.[14] Our review of a trial court's decision to deny a motion for mistrial is limited to determining whether the court abused its discretion. *State v. Terry*, 333 Or 163, 175-76, 37 P3d 157 (2001), *cert den*, 122 S Ct 2368 (2002).

---

[14] As noted, defendant was arrested on March 1, 1999. In opening statement, the prosecutor stated:

"As to the motive, additionally, in divorces, of course, there are assets to be divided amongst the spouses. The defendant's assets were significant. Within the divorce file is this affidavit of the defendant, which is dated July 1 of 1999, actually. 'I, Ivar Voits, being first duly sworn, depose and say, I am defendant in the above action. I have been incarcerated since March 1, 1999. For this reason, I have estimated my assets to the best of my ability at this time as follows.

"[DEFENSE COUNSEL]: I have a matter for the Court."

After a colloquy off the record, the trial court gave the following limiting instruction:

"Ladies and gentlemen of the jury, before we proceed with the balance of [the prosecutor's] opening statement, I have a cautionary instruction for you. First let me re-emphasize to you that the opening statements of counsel, whether it be the prosecutor or the defense attorney, are not evidence. They are merely what the attorneys believe that the evidence will be.

"Secondly, there has been reference in the prosecutor's opening statement as to the release status, whether or not defendant was incarcerated on this charge at some prior time. That is irrelevant to the issues that you have to decide in this case. It's not to be considered by you in deciding this particular case."

"Even if we find the prosecutor's remarks to be improper, tasteless, or inappropriate, we will not find an abuse of discretion in the trial court's denial of the motion for a mistrial unless the effect of the prosecutor's remarks is to deny a defendant a fair trial."

*State v. Smith*, 310 Or 1, 24, 791 P2d 836 (1990).

Defendant analogizes the prosecutor's comment here to circumstances in which a defendant is brought into court in prison clothes or shackles or where a prosecutor comments on a defendant's silence—both of which involve reduced appellate deference to the trial court's decision. *See, e.g., State v. White*, 303 Or 333, 344, 736 P2d 552 (1987) (prosecutor's comment on defendant's refusal to testify was reversible error); *State v. Kessler*, 57 Or App 469, 475, 645 P2d 1070 (1982) (trial court erred in failing to articulate the reasons that there was a "substantial necessity" to shackle defendant).

Those analogies are inapposite. The prosecutor's comment did not focus on defendant's custodial status itself or any reasons therefor, such as dangerous conduct or a risk of flight. Rather, the prosecutor's remarks referred to defendant's status as an incarcerated person only in passing, in the context of a document addressing defendant's financial circumstances and his possible financial motive for the alleged crime. In addition, the offending reference to defendant's pretrial incarceration was redacted when the relevant document later was received in evidence, and the prosecutor did not refer to it again. Finally, the cautionary instruction that the trial court gave to the jury was sufficient to remedy any potential prejudice to defendant. *See State v. Thompson*, 328 Or 248, 271, 971 P2d 879, *cert den*, 527 US 1042 (1999) ("Jurors are presumed to follow a trial court's instructions."). The trial court did not abuse its discretion in denying defendant's motion for a mistrial. *See State v. Pratt*, 316 Or 561, 583, 853 P2d 827 (1993) (no abuse of discretion to deny a mistrial based on suggestion that defendant was on death row where reference was isolated and made in passing).

Affirmed.