Argued and submitted September 7, on appeal, sentence vacated and remanded for resentencing; otherwise affirmed; on cross-appeal, affirmed December 26, 2007 petition for review allowed May 7, 2008 (344 Or 539)

STATE OF OREGON,
*Plaintiff-Appellant
Cross-Respondent,*

*v.*

VERONICA RODRIGUEZ,
*Defendant-Respondent
Cross-Appellant.*

Washington County Circuit Court
C051244CR; A131050

174 P3d 1100

Timothy A. Sylwester, Assistant Attorney General, argued the cause for appellant - cross-respondent. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Jamesa J. Drake, Deputy Public Defender, argued the cause for respondent - cross-appellant. On the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Rankin Johnson, Rebecca Davis, and Emily Simon filed the brief *amicus curiae* for Oregon Criminal Defense Lawyers Association.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

ROSENBLUM, J.

## ROSENBLUM, J.

A jury convicted defendant of one count of sexual abuse in the first degree, ORS 163.427(1)(a)(A), a Measure 11 offense for which a mandatory minimum sentence of 75 months is prescribed by ORS 137.700(2)(a)(P). The trial court concluded that the prescribed sentence would amount to cruel and unusual punishment in violation of Article I, section 16, of the Oregon Constitution. The court instead imposed a sentence of 16 months, the minimum presumptive sentence under the sentencing guidelines. The state appeals, assigning error to the court's refusal to impose the Measure 11 sentence. Defendant cross-appeals, arguing that there is insufficient evidence to support her conviction. On defendant's cross-appeal, we affirm without discussion. On the state's appeal, we conclude that the trial court erred in failing to impose the Measure 11 sentence.

In early 2004, defendant was employed by the Hillsboro Boys and Girls Club to work with at-risk youths. She was initially employed as a "Prevention Coordinator." At trial, she explained that her position was so titled because "we're preventing the kids from doing things such as getting pregnant in high school, preventing them from joining a gang, preventing them from dropping out of school. Trying to get to them before those situations happen." Defendant eventually moved to a position with the "Youth Family Services" department, which performs the same kind of work but also does community outreach specifically targeting youths aged 9 to 17. Defendant also coached one of the club's basketball teams.

The victim was a member of the club. He lived in a low-income area and had a very unstable home life. He struggled in school and had difficulty with anger management. Defendant met the victim shortly after she began working at the club. He was 12 years old at the time; she was 24. Defendant learned that he had previously developed a close relationship with Walsh, a male staff member who had since left the club, and that he was having difficulty dealing with Walsh's departure.

Defendant met the victim's mother and siblings at the victim's basketball games. She developed a close relationship with the family, including the victim. She visited them at their home frequently—for a period, she went there nearly every day after work. She helped the victim with his homework and often ate with the family. She sometimes gave the victim a ride home from the club and drove him to school in the morning. All of defendant's contact with the victim outside of club-organized activities violated the club's rules.

Over time, defendant's relationship with the victim became exceptionally close. Their conduct at and outside the club raised concerns among other staff members and became the subject of rumors among other children at the club, who called the victim defendant's "boyfriend." Defendant and the victim frequently hugged each other, and defendant sometimes put her arm around the victim when they walked. Defendant occasionally allowed the victim to sit on her lap in her office. He kissed her on the cheek between 10 and 20 times. She sent e-mail messages to him in which she said, "I love you" and "love you lots." The victim sent similar messages to her, including one that said, "[S]ee you later Babe I love you for ever," and another that ended, "I LOVE YOU SO ................ MUCH." Defendant took the victim with her on several trips to Bend and Spokane, two of which were overnight trips. The two were frequently alone together in her car, at her apartment, and at his home. They were seen alone together in her office at the club with the door closed.

On February 14, 2005, a staff member named Villalobos saw defendant and the victim in the game room at the club. There were approximately 30 to 50 youths and at least one other staff member in the room. The victim, who had since turned 13, was sitting on a chair. Defendant, who had since turned 25, was standing behind him, caressing his face and pulling his head back; the back of his head was pressed against her breasts. Villalobos crossed the room and pointed defendant and the victim out to Malunay, another staff member, who had his back to them. Malunay turned and saw defendant run her hands along the victim's face and through his hair while the back of his head was against her breasts. The contact lasted approximately one minute.

Villalobos later reported the incident to his supervisor, and the police were notified. Defendant was eventually charged with first-degree sexual abuse based on the incident.[1] A jury found defendant guilty.

It bears emphasizing that the jury necessarily found that defendant acted with a sexual purpose. ORS 163.427(1)(a)(A) provides that a person commits first-degree sexual abuse when that person "[s]ubjects another person to sexual contact and * * * [t]he victim is less than 14 years of age[.]" ORS 163.305(6) defines "sexual contact" as "any touching of the sexual or other intimate parts of a person or causing such person to touch the sexual or other intimate parts of the actor *for the purpose of arousing or gratifying the sexual desire of either party*." (Emphasis added.)

At sentencing, the prosecutor asked the court to impose the 75-month sentence prescribed by ORS 137.700 (commonly referred to as "Measure 11"). Defendant objected, arguing that the Measure 11 sentence would be unconstitutionally excessive. Numerous family members, friends, and coworkers testified in support of defendant. The court agreed with defendant that a 75-month sentence would be cruel and unusual. The court observed that defendant had no prior criminal record and that she had "lived an exemplary life" and had "really made a very positive impact into the lives of apparently many children * * *." It further noted that the touching occurred "in a crowded room, over clothing, [and was] not prolonged." The court concluded that a 75-month sentence "just cries out" as being shocking to any reasonable person. It imposed a 16-month sentence. This appeal followed.

█ Before we recite the parties' arguments, a brief overview of the pertinent law is helpful to place those arguments in context. Article I, section 16, provides, in part, "Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense." In *Sustar v. County*

---

[1] Defendant was actually charged with two counts of first-degree sexual abuse. One of the counts was based on a report that, on another occasion, two staff members saw the victim standing behind defendant with his arms wrapped around her so that they were on her breasts. That count resulted in a hung jury. The state later dismissed the charge, and it is not pertinent to this appeal.

*Court for Marion Co.*, 101 Or 657, 665, 201 P 445 (1921), the Supreme Court held, "In order to justify the court in declaring punishment cruel and unusual with reference to its duration, the punishment must be so proportioned to the offense committed as to shock the moral sense of all reasonable [persons] as to what is right and proper under the circumstances."[2] Three principles lie at the core of the analysis under the "shocks the moral sense" test. First, "[t]he power to declare what punishment may be assessed against those convicted of crime is not a judicial, but a legislative, power, controlled only by the provisions of the constitution." *State v. Smith*, 128 Or 515, 524, 273 P2d 323 (1929); *see also State v. Ferman-Velasco*, 157 Or App 415, 423, 971 P2d 897 (1998), *aff'd*, 333 Or 422, 41 P3d 404 (2002) ("The people, as well as the legislature, are entitled to make determinations about what punishments should be imposed for crimes."). Second, Oregon courts have been extremely deferential to the legislature's—and the people's—prerogative in establishing punishments. *State v. Meyrovich*, 204 Or App 385, 392-93, 129 P3d 729, *rev den*, 340 Or 673 (2006). Third, Article I, section 16, forbids only those sentences that are *grossly*

---

[2] Although the court noted in *Sustar* that the prohibition against cruel and unusual punishment and the command that all penalties shall be proportioned to the offense are separate clauses of Article I, section 16, it has applied the same standard under both clauses. *See State v. Isom*, 313 Or 391, 401, 837 P2d 491 (1992) (stating that the "standard for holding that a sentence is disproportionate to the offense" is whether the sentence is "so disproportionate to the offense as to shock the moral sense of all reasonable persons as to what is right and proper"); *State v. Rogers*, 313 Or 356, 380, 836 P2d 1308 (1992), *cert den*, 507 US 974 (1993) ("The standard for determining whether punishment is cruel and unusual is whether 'the punishment [is] so proportioned to the offense committed as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances.' " (quoting *Sustar*, 101 Or at 665) (brackets in *Rogers*)). This court has likewise applied the same standard under both clauses. *See, e.g., State v. Meyrovich*, 204 Or App 385, 392, 129 P3d 729, *rev den*, 340 Or 673 (2006) (proportionality challenge); *State v. Mercado-Vasquez*, 166 Or App 15, 21, 998 P2d 743 (2000) ("cruel and unusual punishment" challenge). Indeed, we have treated the clauses as essentially interchangeable. *See State v. Thorp*, 166 Or App 564, 569-70, 573, 2 P3d 903 (2000), *rev dismissed*, 332 Or 559 (2001) (stating that the question before the court was whether the sentence that the trial court refused to impose would have been cruel and unusual, but analyzing the issue as a proportionality challenge). *But see Meyrovich*, 204 Or App at 392 (noting that there is some disagreement as to whether the same test applies to both clauses); *Thorp*, 166 Or App at 582 (Brewer, J., concurring) (asserting that the standard applies only to the "cruel and unusual punishment" clause).

disproportionate to the offense. *See State v. Teague*, 215 Or 609, 611, 336 P2d 338 (1959) (affirming 12-year sentence for forgery despite questioning "what prompted the court in the first instance to impose the seemingly lengthy sentence").

4.	In *State v. Thorp*, 166 Or App 564, 2 P3d 903 (2000), *rev dismissed*, 332 Or 559 (2001), a majority of the members of this court agreed that the three-part test articulated in *Solem v. Helm*, 463 US 277, 284, 103 S Ct 3001, 77 L Ed 2d 637 (1983), provides objective criteria that can aid in determining whether a sentence is proportional to the offense. 166 Or App at 571 (lead opinion); *id.* at 589-90 (Haselton, J., dissenting). Under the *Solem* test, courts consider (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed for other offenses in Oregon; and (3) the sentences imposed for the same offense in other jurisdictions. *Id.* Although the lead opinion and the dissent found the *Solem* test to be helpful, the court did not hold that the test is dispositive. Indeed, we have since resolved at least one proportionality challenge without expressly applying the *Solem* test. *See Meyrovich*, 204 Or App at 392 (rejecting a proportionality challenge without referring to the *Solem* test and stating that the "shocks the moral sense" standard is "the irreducible core of our analysis").

We turn to the parties' arguments. The state contends, among other things, that, given the nature of the relationship between defendant and the victim, the 75-month sentence mandated by Measure 11 would not shock the moral sense of all reasonable people.[3] In response, defendant contends that application of the *Solem* test demonstrates that a

---

[3] The state also argues that we can infer that imposition of the Measure 11 sentence would not shock the moral sense of all reasonable people from either of two facts: (1) the fact that a majority of the voters approved the measure; and (2) the fact that the legislature has created exceptions to the prescribed mandatory sentences in some circumstances but has not created one that would apply here. The state's argument rests on the proposition that the voters and the legislature necessarily had in mind every conceivable form of sexual abuse and every circumstance in which it might be committed when they passed Measure 11 and created exceptions thereto. We have previously declined to endorse the state's reasoning. *See State v. Shoemaker*, 155 Or App 416, 419, 965 P2d 418, *rev den*, 328 Or 41 (1998) ("[W]e wish to make clear that we neither endorse nor adopt the state's proposed reading of Article I, section 16."). Because we conclude on other grounds that the Measure 11 sentence would not violate Article I, section 16, in this case, we need not revisit the state's argument.

75-month sentence would be unconstitutional.[4] Alternatively, defendant urges us to jettison the *Solem* test and the "shocks the moral sense" test and to adopt a new analysis that she proposes. Briefly, she argues that a sentence is unconstitutionally disproportionate if it does not serve the purposes of punishment as enunciated in Article I, section 15, of the Oregon Constitution.

We begin by addressing defendant's arguments that we should abandon both the *Solem* test and the overarching "shocks the moral sense" test. We decline defendant's invitation on both counts. The latter argument requires little discussion: We may not reject the "shocks the moral sense" test for the simple reason that it is the test that the Supreme Court has prescribed. *See State v. Isom*, 313 Or 391, 401, 837 P2d 491 (1992) (stating that the "standard for holding that a sentence is disproportionate to the offense" is whether the sentence is "so disproportionate to the offense as to shock the moral sense of all reasonable persons as to what is right and proper"); *State v. Rogers*, 313 Or 356, 380, 836 P2d 1308 (1992), *cert den*, 507 US 974 (1993) ("The standard for determining whether punishment is cruel and unusual is whether 'the punishment [is] so proportioned to the offense committed as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances.'" (quoting *Sustar*, 101 Or at 665) (brackets in *Rogers*)). For the same reason, we do not consider defendant's proposed new analysis.

With respect to the *Solem* test, defendant urges us to abandon it for three reasons. First, she argues that it is not free from analytical pitfalls, as noted in Chief Judge Brewer's concurring opinion in *Thorp*, 166 Or App at 583. Second, she points out that the continuing vitality of the test in the federal courts is questionable, given that, in *Harmelin v.*

---

[4] Defendant also argues that a 75-month sentence would violate Article I, section 16, under the "rational basis" test advanced by Chief Judge Brewer in his concurring opinion in *Thorp*. *See* 166 Or App at 585 ("If there is an arguably rational basis for the application of a mandatory sentence to a particular defendant, then, by force of logic, the moral sense of at least some reasonable people would not be shocked by the sentence."). Like the *Solem* test, the rational basis test serves as a "gloss" on the "shocks the moral sense" standard. Because we are able to resolve this case under the unadorned "shocks the moral sense" standard, we need not consider the rational basis test.

*Michigan,* 501 US 957, 111 S Ct 2680, 115 L Ed 2d 836 (1991), the proposition that the Eighth Amendment includes a proportionality requirement did not garner the support of a majority of the Court. Defendant argues that reliance on a partially rejected federal test makes little sense. Finally, she argues that "lock-step adherence to a federal test" violates the basic principles of state constitutional interpretation.

Defendant misunderstands the motives of the judges who applied the *Solem* test in *Thorp.* They applied it not because this court is bound by the rulings of the United States Supreme Court on questions concerning the Oregon Constitution, but because it provided a useful analytical tool for a legal issue in which their subjective views were a genuine concern to them. At the margins, it can be difficult to separate subjective views of what is just from an objective determination of what is shocking to all reasonable people.[5] *See Thorp,* 166 Or App at 582 (Brewer, J., concurring) (acknowledging that belief that most people would consider the Measure 11 sentence in that case to be unreasonable "includes a subjective component that is the product of a beholder's personal sense of fairness"); *id.* at 588 n 2 (Haselton, J., dissenting) ("It is *not* easy to draw constitutionally principled lines." (Emphasis in original.)). Objective criteria can be helpful in those cases to avoid allowing judicial decisions to be infected by the judges' own subjective views as to what is proper under the given circumstances. The *Solem* test offers three such criteria.

The vitality of the *Solem* test in the federal courts is uncertain because, after *Harmelin,* it is an open question whether the Eighth Amendment contains a proportionality guarantee. Whatever the answer to that question may be, the Oregon Constitution does contain such a guarantee, and the

---

[5] *Thorp* illustrates that difficulty. In that case, the 16-year-old defendant was convicted of second-degree rape for having sex with his 13-year-old girlfriend. The trial court refused to impose the 75-month sentence mandated by Measure 11. 166 Or App at 566. On appeal, both of the concurring opinions and the dissent, which collectively represented the views of seven of the nine judges that considered the case, expressed the subjective view that the Measure 11 sentence was unjust. *See id.* at 581 (Edmonds, J., concurring); *id.* at 582 (Brewer, J., concurring); *id.* at 587 (Haselton, J., dissenting). (The lead opinion did not disclose the personal views of the other two judges.) Ultimately, a majority of the court concluded that reasonable people could disagree with that view.

value of objective criteria in analyzing challenges under that guarantee remains, regardless of how the United States Supreme Court ultimately treats *Solem*.[6]

We acknowledge that the *Solem* test is not without potential analytical pitfalls. *See Thorp*, 166 Or App at 583 (Brewer, J., concurring) (identifying concerns). Moreover, applying the test is not always necessary to determine whether a sentence violates Article I, section 16. *See id.* at 577-78 (lead opinion) (stating that the morally shocking nature of some sentences may be self-evident); *see also Meyrovich*, 204 Or App at 392 (rejecting a proportionality challenge without referring to the *Solem* test). Nevertheless, we conclude that the *Solem* test, if not always dispositive, can provide useful, objective guidance in analyzing sentencing challenges at the margins of Article I, section 16.[7] *See Thorp*, 166 Or App at 583 (Brewer, J., concurring) (acknowledging that "the *Solem* test is helpful"). Accordingly, we will continue to apply it in cases where the facts are such that we have serious doubts as to whether a particular sentence would or would not shock the moral sense of all reasonable people.

■ This is not one of those cases, so we do not apply the *Solem* test here. Of course, the gravity of the offense and the

---

[6] Defendant's third argument actually undercuts her second one. Because we do not construe the Oregon Constitution in "lock-step adherence" to federal law, when we agree with the reasoning of a federal analysis, our continued reliance on that reasoning is unaffected if the federal courts later disavow that analysis. Indeed, rejecting the *Solem* test merely because its continuing vitality in federal courts is questionable would, it seems, amount to lock-step adherence to federal law.

[7] In the end, a truly objective determination of whether a given sentence shocks the moral sense of all reasonable people may be impossible. Although each judge's personal sense of fairness may indeed be "a pitifully small spoke in the diverse wheel of community values," *Thorp*, 166 Or App at 582 (Brewer, J., concurring), it may simply fall upon us to exercise our office as judges to determine what a "reasonable person" would find shocking. *See id.* at 581 (Edmonds, J., concurring) ("[W]e are constrained to uphold the law unless we can say, based on our value judgment, that the sentence shocks the conscience of all reasonable people."); *id.* at 589 (Haselton, J., dissenting) ("It thus devolves to us, constitutionally and collectively, to make an objective determination of the limits of 'reasonableness.' "); *cf. State v. Ice*, 343 Or 248, 260, 170 P3d 1049 (2007) (determining whether a fact identified by the legislature as a sentencing factor is functionally an element of a crime: "Although the answer to that question may be obvious in most cases, there will be some cases in which courts will simply be making their best call * * *.").

harshness of the penalty—the factors considered in the first *Solem* criterion—are central to the question whether a sentence would shock the moral sense of all reasonable people. Thus, as in every proportionality challenge, we do consider those factors.

Viewing defendant's conduct in the totality of the circumstances, we have no difficulty concluding that at least some reasonable people would find the sentence required under Measure 11 not to be unduly harsh. Defendant focuses on the nature of the contact that occurred, emphasizing that it was between the back of the victim's head and defendant's clothed breasts and implying that, among the broad range of conduct that constitutes first-degree sexual abuse, the contact was relatively innocuous.[8]

Defendant's focus on the conduct alone is too narrow. We need not decide whether her conduct, when considered in a vacuum, is sufficiently minor that imposing the Measure 11 sentence would violate Article I, section 16. We agree with the state that, given the nature of the relationship between defendant and the victim, there can be no doubt that the Measure 11 sentence would not shock the moral sense of all reasonable people. It is undisputed that the victim was young and vulnerable, a prototypical "at-risk" youth. Defendant was in a position of trust and responsibility, akin to that of a teacher or youth counselor, charged with helping children make appropriate behavioral choices. By engaging in sexual conduct with the victim, defendant seriously abused that trust.

In short, we cannot say that the 75-month sentence required under Measure 11 would shock the moral sense of

---

[8] Defendant also argues that her offense should not be seen as particularly grave, given the history of Oregon's criminal code with respect to sexual conduct. She notes that, before 1971, the conduct for which she was convicted was not a crime in Oregon. Furthermore, she observes, until 1991, it constituted only a misdemeanor, *see* ORS 163.415 (1989), *amended by* Or Laws 1991, ch 830, § 1, and, from 1991 until 1995, when Measure 11 took effect, although a felony, it was not subject to any mandatory sentencing provision.

Notwithstanding that history, we do not share defendant's view. That history indicates only that society has evolving standards of conduct and, more importantly for present purposes, an evolving understanding of the seriousness of sexual contact between adults and children. In short, the historical perception of her conduct did not lessen its seriousness in 2005.

all reasonable people as to what is right and proper under the circumstances. It follows that the trial court erred in refusing to impose that sentence.

On appeal, sentence vacated and remanded for resentencing; otherwise affirmed. On cross-appeal, affirmed.